MW

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Andres Dominguez,

                Plaintiff,

vs.

City of Scottsdale, et al.,

                Defendants.

No.  CV-21-00089-PHX-SRB (MTM)

**ORDER**

      Plaintiff Andres Dominguez, through counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona law.  Defendants City of Scottsdale, Daniel Koller, and Nikolas McElley have filed a Motion for Summary Judgment (Doc. 25).  The Motion is fully briefed. It will be granted in part and denied in part.[1]

**I.    Background**

      On January 15, 2021, Andres Dominguez filed a civil rights Complaint against the City of Scottsdale and Scottsdale Police Officers Daniel Koller and Nikolas McElley, bringing claims arising from the officers' use of force and arrest on January 19, 2020. (Doc. 1.)

      In Count One of his four-count Complaint, Dominguez asserts a state law claim for tortious assault and battery, alleging Koller and McElley are directly liable for assaulting and battering him without justification while acting in the course and scope of their employment for Scottsdale, and Scottsdale is vicariously liable.  In Count Two, Dominguez

---

[1] Neither party has requested oral argument and the Court finds this matter is suitable for a decision on the briefs without a hearing.

brings a state law claim for negligence against Scottsdale, claiming it breached its duty of care by failing to supervise and train its officers and adopt policies with respect to the seizure of suspects and the use of force.  In Count Three, Dominguez brings a 42 U.S.C. § 1983 claim against Koller and McElley for excessive use of force in violation of the Fourth Amendment.  In Count Four, Dominguez brings a § 1983 claim against Koller and McElley for false arrest in violation of the Fourth Amendment.

Defendants requested, and were granted, leave to file an early motion for summary judgment.  (Docs. 13-14.)[2]  Defendants move for summary judgment on all claims arguing: (1) they are entitled to qualified immunity on Dominguez's § 1983 excessive force and false arrest claims; (2) the assault and battery claim against Koller and McElley is barred because they were not served with a notice of claim; (3) the claim for assault and battery against Scottsdale fails because it cannot be held vicariously liable as a matter of law; (4) alternatively, Koller and McElley are immune from liability for the assault and battery claim because the use of force was justified; and (5) the negligence claim against Scottsdale fails as a matter of law, because the alleged underlying torts by Koller and McElley were justified.

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts

---

[2] Defendants were also granted advance leave to file a second motion for summary judgment on the merits of any surviving claims.  (*Id.*)

1   to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

2   contention is material, i.e., a fact that might affect the outcome of the suit under the

3   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

4   jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

5   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

6   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

7   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

8   it must "come forward with specific facts showing that there is a genuine issue for trial."

9   *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

10   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

11        At summary judgment, the judge's function is not to weigh the evidence and

12   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

13   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

14   all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

15   materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

16   **III.   Facts**

17        The following facts are either undisputed by the parties or, if disputed, recounted in

18   the light most favorable to Dominguez, the non-moving party.[3]

19        **A.   Traffic Stop**

20        On January 19, 2020, Dominguez was driving home from dropping off keys at a

21   condominium complex in Scottsdale, Arizona, to change clothing before his 8:00 p.m.

22   work shift as a security guard at another complex.  (PSOF ¶¶ 113, 121.)  En route,

23   Dominguez turned northbound onto Scottsdale Road, stopped at a red traffic light at

24   Highland Avenue, and then made a U-turn on green and continued southbound on

---

26        [3] The facts are taken from Defendants' Statement of Facts ("DSOF") and exhibits
(Doc. 20) and Plaintiff's controverting Statement of Facts ("PSOF") and exhibits (Doc.
27   34).  Defendants' exhibits include video recordings from Koller and McElley's on-body
cameras ("OBC") as well as written transcripts of those recordings (Doc. 20-1 at 24-54,
28   74-131).  The facts are recounted "in the light depicted by the videotape[s]," *Scott v. Harris*,
550 U.S. 372, 380 (2007), and any factual ambiguities in the video evidence are viewed in
Dominguez's favor, *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007).

1     Scottsdale Road.  (*Id.* ¶¶ 114-116.)  Along the way, Officer Koller, who was on routine

2     patrol that evening, saw Dominguez driving and observed his vehicle cross between the

3     lanes multiple times.  (PSOF ¶¶ 1, 14; DSOF ¶¶ 1, 14.)  Koller also observed that the

4     vehicle registration sticker on the upper right side on Dominguez's license plate had

5     expired.  (DSOF ¶ 3.)

6          Koller followed Dominguez's vehicle to a safe area and activated his emergency

7     lights to initiate a traffic stop at approximately 7:15 p.m.  (PSOF ¶¶ 18-19; DSOF ¶¶ 18-

8     19.)  Dominguez then slowed down, made a right turn onto First Street, and parked in an

9     angled parking spot at 7146 East First Street.  (PSOF ¶¶ 22, 119-120; DSOF ¶ 22.)[4]  Once

10    stopped, Koller noticed that Dominguez's license plate had a second registration sticker on

11    the upper left side that was current and unexpired.  (DSOF ¶ 25.)

12          Koller activated his on-body camera and approached the driver's side window of

13    Dominguez's vehicle, which was rolled down halfway.  (PSOF ¶¶ 26, 122; DSOF ¶ 26.)

14    Dominguez pulled out his driver's license and proof of insurance, which he held in his

15    hands when Koller approached.  (PSOF ¶ 122.)  Koller greeted Dominguez with "What's

16    up man?"; Dominguez replied back "What's up?"  (Doc. 20-1 at 25.)  Koller asked where

17    he was headed, and Dominguez stated he was going home to Tempe to get changed for

18    work.  (*Id.*)  The following exchange then ensued:

19          Dominguez:     What did—did I break a law?

20          Koller:         You live in Tempe?

21          Dominguez:     I live in Tempe.

22          Koller:         Okay.  What's with the attitude, man?

23          Dominguez:     I'm in a hurry and I don't know—I don't break—I'm a very,
                             very cautious, good driver . . . I saw you when I made my U-
24                              turn . . . I know I didn't break any laws, so I'm curious to why
                             you—
25

26          Koller:         . . . You know that you didn't break any laws? . . . So, are you
                             saying that I'm violating your rights right now?

27

28          [4] Defendants claim Dominguez was delayed in responding to the emergency lights
and had passed several places where he could have pulled over before he stopped.  (DSOF
¶¶ 20-23.)

| | | |
|---|---|---|
| Dominguez: | . . . I haven't had a traffic ticket in a very long time. . . I'm a very good driver . . . So, what's up? |
| Koller: | Okay, so. . . do you just not like the police or what? |
| Dominguez: | Look, sir.  I don't have time for this. I have to go home.  I have to get changed.  I have a shift that starts at 8 o'clock. |
| Koller: | Well, that's going to take you longer if you keep the attitude. |
| Dominguez: | Well, I don't have an attitude.  Do you want to tell me what you need? |
| Koller: | Yeah, I need your license, registration, proof of insurance.  I also need to know if there's any guns or knives in the car. |
| Dominguez: | I don't have any guns.  I'm an armed guard, but I don't have my gun with me . . . I'm a security guard. |

(*Id.* at 26-27.)

The two then began to discuss where Dominguez worked as a security guard, what Dominguez had done earlier in the day, and where Dominguez was coming from at the time he was pulled over.  (*Id.* at 27-28; PSOF ¶ 135.)  During this discussion, Dominguez searched around his vehicle, reached into his glove compartment, and reached into his back pocket and pulled out items which he put in the passenger seat.  (Koller OBC at 00:59-01:36; McElley OBC at 00:12-00:25.)  At the same time, Officer McElley arrived as backup, activated his on-body camera, approached the passenger door, and pointed his flashlight inside the vehicle.  (*Id.*; PSOF ¶¶ 32, 135; DSOF ¶ 32.)

Dominguez held out his license and insurance, prefacing that the vehicle was registered to his mother.  (Doc. 20-1 at 28; PSOF ¶ 133.)  Koller responded "So, you're a security guard, but you have an attitude towards the police? . . . you have almost the same job as we do."  (Doc. 20-1 at 29.)  Dominguez replied "I don't know what you're talking about attitude.  You better lose your attitude, okay . . . I don't even know what you . . .", at which time Koller opened the driver's door and stated "Okay . . . go ahead and step out of the car."  (*Id.*; PSOF ¶ 138; DSOF ¶ 40.)

### B.     Removal

In rapid succession, Koller told Dominguez again to step out of the car several times, while Dominguez simultaneously responded "You don't have a right to open the door . . .

This is private property." (Doc. 20-1 at 29.) Dominguez claims Koller stepped towards him and positioned himself between Dominguez and the open door, physically preventing Dominguez from exiting the vehicle. (PSOF ¶¶ 138, 140.) As Koller moved closer to Dominguez and ordered him to get out of the car again, Dominguez put his hands in the air, holding his license and insurance in hand, and told Koller "Do not touch me." (Doc. 20-1 at 29; PSOF ¶¶ 41, 140.) Koller then moved closer and told Dominguez "Get out of the car, or I'm going to rip you out of the car." (Doc. 20-1 at 30; PSOF ¶ 141.) At the same time, Dominguez repeated "Do not touch me" and reached for his phone on the passenger seat. (*Id*.)[5] As he leaned over, Koller reached in, tore Dominguez's shirt, grabbed him around the neck, and told him again to get out of the car. (Doc. 20-1 at 30; PSOF ¶¶ 112, 142.) In response, Dominguez told Koller "I haven't done anything." (Doc. 20-1 at 30.)

Koller then attempted an "inside take-down" by pulling and pushing down on Dominguez's head, applying a "hammer fist" strike to Dominguez's suprascapular nerve, and kicking the inner thigh of Dominguez's right leg. (PSOF ¶ 143; DSOF ¶¶ 66, 69-71, 77-78.) Koller repeated his orders to get out and told Dominguez "I'm going to hurt you if you don't get out of the car right now." (Doc. 20-1 at 31.) Koller continued to "repeatedly punch, kick, elbow, and knee [Dominguez] in the face and body," while he repeated orders for Dominguez to get out of the car and on the ground. (Doc. 20-1 at 31-32; PSOF ¶¶ 51, 99, 112, 142.) At the same time, Dominguez said repeatedly "I'm not doing anything." (Doc. 20-1 at 31-32.) Dominguez claims he was unable to comply with the orders to get out of the car onto the ground because Koller was striking him and holding him by the head. (PSOF ¶ 143.)

Meanwhile, McElley entered through the rear of the vehicle and began to grab and push Dominguez from behind and applied a hammer fist strike to Dominguez's upper left suprascapular nerve. (PSOF ¶¶ 64-65, 112, 146; DSOF ¶¶ 64-65.) Koller continued to

---

[5] Dominguez claims he feared for his safety and reached over for his phone so that he could record Koller. (PSOF ¶¶ 140-141.)

strike and push down on Dominguez's head and body, while McElley also pushed and attempted follow-up strikes from behind.  (PSOF ¶¶ 68, 146; DSOF ¶ 68.)  Dominguez claims that as Koller continued to push his head towards the ground, he had to brace himself on the steering wheel to avoid falling face-first on the ground.  (PSOF ¶¶ 145, 147.)

Dominguez claims he did not use any physical force against the officers or physically resist them in anyway while inside the vehicle.  (PSOF ¶¶ 142, 148.)[6]

### C.   Take-Down

Dominguez was ultimately able to place his feet on the ground, and while still being pushed downward by Koller, Dominguez stood out the car.  (PSOF ¶¶ 72, 96, 147.)  Koller then grabbed Dominguez by the waist, lifted Dominguez into the air, and slammed Dominguez on the ground head-first, while he repeated his order for Dominguez to get on the ground.  (Doc. 20-1 at 31-32; PSOF ¶¶ 147, 149; DSOF ¶ 80.)

### D.   Handcuffing

Dominguez laid down on the ground, positioned on his right side.  (PSOF ¶ 151.)  McElley applied pressure with his knees and bodyweight to Dominguez's legs, knees, and ankles, and administered knee strikes in the back of Dominguez's thighs.  (PSOF ¶¶ 93-94, 153, 159; DSOF ¶ 87.)  Koller applied pressure with his bodyweight to the upper half of Dominguez's body, pinning Dominguez's left arm above his body and his right upper arm beneath the right side of his body.  (PSOF ¶¶ 85-87, 157.)

McElley gave Dominguez repeated orders to "stop fighting" and "stop resisting," while Koller threatened to tase Dominguez.  (Doc. 20-1 at 32-33.)  While holding his hands open out in front of him, Dominguez asked Koller not to tase him and responded, among other things, "I didn't fight," "I got the insurance right here," "You're hurting me," "I got nothing in my hands," and "I don't have any weapons."  (*Id.*; PSOF ¶¶ 85-87.)  While McElley continued to repeat his orders to "stop fighting" and "stop resisting," Koller ordered Dominguez to release his hands and put his hands behind his back, and Dominguez

---

[6] Defendants claim Dominguez had "locked his right leg in the door frame" to prevent his removal and "was attempting to tackle and push against Officer Koller and hit the officer in the stomach and groin area." (DSOF ¶¶ 58, 77.)

began to repeatedly yell for help and howl in pain.  (Doc. 20-1 at 33-34.)  Dominguez claims that because Koller was pinning his arms down on his sides, he was unable to comply with Koller's order to put his hands behind his back.  (PSOF ¶¶ 85-87, 157.)

Koller then "applied a mandibular angle pain compliance technique wherein he pressed the tip of his thumb into Dominguez's mandibular nerve (behind his ear)" and slammed Dominguez's face into the asphalt.  (PSOF ¶¶ 90-91, 99, 158; DSOF ¶¶ 90.) Koller released pressure on Dominguez's side and Dominguez put his hands behind his back.  (PSOF ¶ 92; DSOF ¶ 92.)  Koller then handcuffed Dominguez and McElley applied continued pressure to Dominguez's knees and ankles with his knees and bodyweight. (PSOF ¶¶ 92-94, 99, 159; DSOF ¶¶ 92-94.)  Dominguez responded repeatedly "Please, stop hurting me."  (Doc. 20-1 at 35-36.)

Dominguez claims he did not physically fight with the officers or physically resist in any way while on the ground.  (PSOF ¶¶ 151, 155.)[7]

### E.    Arrest

McElley observed that Dominguez was bleeding and called the Scottsdale Fire Department to medically evaluate him.  (Doc. 20-1 at 34-35, 79; PSOF ¶ 95; DSOF ¶ 95.) After Koller later left the scene, the fire department arrived, and McElley asked Dominguez if he wanted to go to the hospital.  (Doc. 20-1 at 115.)  Dominguez responded that while he wanted to get treated, he didn't know if he would go because he had a shift at work he needed to go to.  (*Id.*)  In response, McElley told Dominguez he was not going to work because "You're under arrest."  (*Id.*)  Dominguez asked "What? What charges? Resisting arrest?", to which McElley replied "Ask the other officer, I'm just here as backup."  (*Id.*) When Dominguez later decided he would go to the hospital, McElley told him that once he was released from the hospital, he would go to jail for "failure to obey a police officer." (*Id.* at 119.)  Dominguez asked, "what did I disobey?" and McElley responded, "Like I said, the other officer is the charging officer.  I'm standing by."  (*Id.*)

---

[7] Defendants claim that "[o]nce on the ground, Dominguez continued to actively resist by twisting around and trying to get up."  (DSOF ¶ 81.)

- 8 -

1    The following day, Dominguez was charged in the Scottsdale City Court, Case No.

2    Case No. SC-2020001275, with refusal to obey police in violation of Scottsdale City Code

3    § 19-13, a misdemeanor offense; failure to comply with police officer in violation of Ariz.

4    Rev. Stat. § 28-622, a misdemeanor offense; resisting arrest in violation of § 13-

5    2508(A)(1), a felony offense; assault in violation of Ariz. Rev. Stat. § 13-1203(A)(3), a

6    misdemeanor offense; improper lane change in violation of Ariz. Rev. Stat. § 28-729(1), a

7    civil traffic violation; improper position during right turn in violation of Ariz. Rev. Stat. §

8    28-751(1), a civil traffic violation; and failure to produce proof of insurance in violation of

9    Ariz. Rev. Stat. § 28-4135(C), a civil traffic violation.  (Doc. 20-1 at 134.)  Pursuant to a

10   plea agreement, Dominguez accepted responsibility for the civil traffic violation for an

11   improper lane, and the remaining charges were dismissed.  (*Id.*; PSOF ¶ 101; DSOF ¶ 101.)

12   **IV.    Section 1983 Claims**

13   Government officials are entitled to qualified immunity from civil damages under

14   42 U.S.C. § 1983 unless (1) the alleged facts, taken in the light most favorable to the party

15   claiming injury, show the official's conduct violated a constitutional right, and (2) that right

16   was "clearly established" at the time of the violation, such that a reasonable official would

17   have known his conduct was unlawful under the circumstances.  *District of Columbia v.*

18   *Wesby*, 583 U.S. ___, 138 S. Ct. 577, 589 (2018); *see Pearson v. Callahan*, 555 U.S. 223,

19   230-32, 235-36 (2009) (courts may address either prong first depending on the

20   circumstances in the case); *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

21   While there need not have been "a case directly on point" that mirrors the specific facts,

22   "clearly established" requires that existing law placed the unlawfulness of the officer's

23   conduct "beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citations

24   omitted); *see Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1167 (9th Cir. 2011) ("the

25   relevant inquiry is whether the state of the law at the time of the official conduct

26   complained of was such as to give the defendants 'fair warning' that their conduct was

27   unconstitutional").

28   . . . .

1      **A.    Excessive Use of Force under 42 U.S.C. § 1983**

2           Defendants argue they are entitled to qualified immunity on Dominguez's excessive

3  use of force claim because the officers' use of force was objectively reasonable, and even

4  if a constitutional violation occurred, no clearly established precedent put the officers on

5  notice beyond debate that their use of force was unconstitutional under the circumstances.

6           **1.    Violation of Constitutional Right**

7           The Fourth Amendment's safeguard against unreasonable seizures prohibits the use

8  of excessive force by law enforcement officers during a traffic stop or an arrest. *Graham*

9  *v. Connor*, 490 U.S. 386, 395 (1989).   To determine whether a Fourth Amendment

10  violation has occurred, courts evaluate whether the officer's use of force was "'objectively

11  reasonable' in light of the facts and circumstances confronting [the officer]," considering:

12  (1) the nature and gravity of the intrusion—i.e., the type and amount of force inflicted;

13  (2) the governmental interests at stake—i.e., the officer's need for the force used, taking

14  into account the severity of the crime, the threat to safety posed by the plaintiff, and whether

15  the plaintiff was actively resisting or attempting to evade arrest; and (3) whether on

16  balance, the intrusion was justified by the governmental interests.  *Graham*, 490 U.S. at

17  396-97; *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010);

18  *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003).

19           In making this determination, courts examine the totality of the circumstances and

20  may consider other factors if appropriate, such as the reasonableness of the officer's

21  conduct leading up to the use of force, including whether proper warnings were given or

22  whether less intrusive alternatives were available.  *Vos v. City of Newport Beach*, 892 F.3d

23  1024, 1034 (9th Cir. 2018); *Young*, 655 F.3d at 1165*; Bryan v. MacPherson*, 630 F.3d 805,

24  831 (9th Cir. 2010).  "The 'reasonableness' of a particular use of force [is] judged from the

25  perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

26  hindsight," *Graham*, 490 U.S. at 396, and "[w]here an officer's particular use of force is

27  based on a mistake of fact, [courts consider] whether a reasonable officer would have or

28  should have accurately perceived that fact," *Torres*, 648 F.3d at 1124.

1

                    **(a)**      **Nature and Quality of Intrusion**

2            According to Dominguez's version of events, which does not clearly conflict with

3   the video evidence, while he was inside the car, Koller repeatedly grabbed, struck, and

4   kicked Dominguez in the head, neck, and body, and McElley repeatedly struck and pushed

5   Dominguez from behind.  Once out of the car, Koller grabbed and threw Dominguez head-

6   first onto the ground.  While on the ground, the officers used pain compliance techniques

7   before and after handcuffing Dominguez; Koller applied pressure with his bodyweight to

8   Dominguez's upper body, neck, and head and slammed Dominguez's face onto the asphalt,

9   and McElley applied pressure with his bodyweight to Dominguez's legs and ankles and

10  struck Dominguez's thighs.  Dominguez claims the officers' actions inflicted substantial

11  pain and caused injuries, including a laceration and hematoma above his right eye.  (PSOF

12  ¶¶ 158-59; Doc. 20-1 at 110-112.)

13           Drawing all reasonable inferences in Dominguez's favor, the force used during his

14  removal from the vehicle, and against him thereafter, was capable of inflicting significant

15  pain and causing serious injury.  The force inflicted was therefore non-trivial and

16  substantial in amount and presents a significant intrusion that must be justified by

17  countervailing government interests.  *See Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th

18  Cir. 2021) (finding officers' "take-down maneuver," whereby they "forcibly thr[ew]

19  [plaintiff] face-first to the pavement," "involved 'substantial' force"); *Coles v. Eagle*, 704

20  F.3d 624, 628 (9th Cir. 2012) (finding force used to extract the plaintiff through broken

21  vehicle window, including kicking and beating him until he was handcuffed, involved

22  "intermediate force" that "present[s] a significant intrusion"); *Nelson v. City of Davis*, 685

23  F.3d 867, 878 (9th Cir. 2012) ("'physical blows or cuts' often constitute a more substantial

24  application of force than categories of force that do not involve a physical impact to the

25  body").

26  . . . .

27  . . . .

28  . . . .

**(b)     Governmental Interests**

**(i)     Severity of Crime**

The first factor, the severity of the crime at issue, weighs against finding there was a significant interest in the immediate use of substantial force.  It is undisputed that Dominguez improperly changed lanes and was pulled over only for suspected civil traffic violations.  While safety concerns incident to routine traffic stops may justify ordering a driver to get out of a vehicle, *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977)), "[t]raffic violations generally will not support the use of a significant level of force."  *Bryan*, 630 F.3d at 828.

Defendants argue that while the encounter "began as a simple traffic stop, . . . Dominguez's actions in refusing to obey police commands and then actively resisting arrest . . . escalated the severity of his crimes from civil traffic infractions to *felonies*."  (Doc. 25 at 15 (emphasis added).)  Defendants, however, do not identify any felony offense Dominguez was suspected of having committed *before* Koller began to use substantial force to remove him from the vehicle and restrain him.  Insofar as Defendants argue that, prior to any use of force, Dominguez committed a misdemeanor by failing to obey Koller's order to get out of the car, such mere disobedience was not violent or inherently dangerous towards others and does not give rise to a significant government interest in using immediate or substantial force to gain his compliance or arrest him.  *Nelson*, 685 F.3d at 881; *Young*, 655 F.3d at 1165; *Bryan*, 630 F.3d at 829 (finding traffic violations and suspected offenses of "resisting a police officer, failure to comply with a lawful order, and using or being under the influence of any controlled substance" were not "inherently dangerous or violent" and did not support the use of significant force).  Accordingly, the severity of the crime at issue weighs against finding there was an objectively heightened interest in the use of force.

**(ii)     Immediate Threat to Officers or Others**

Viewing the evidence in the light most favorable to him, a reasonable jury could find Dominguez did not pose "an immediate threat to the safety of the officers or others"

1    that justified the immediate or substantial use of force.  *Young*, 655 F.3d at 1163.

2          Defendants claim Koller believed Dominguez posed a threat to officer safety

3    because he was "anti-law enforcement," justifying the use of force to remove him from the

4    car.  Defendants, however, fail to point to objective facts in the record that substantiate

5    Koller's belief or concern.  *See Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)

6    (an officer's stated fear for safety is not enough; "there must be objective factors to justify

7    such a concern").  Dominguez was suspected of having committed only traffic violations,

8    did not verbally refuse to comply with any commands, answered the questions asked of

9    him, and provided the documents requested without objection.  Dominguez did not verbally

10   or physically threaten either officer.[8]  Nor did Dominguez make any statement that could

11   be objectively viewed as hostile towards law enforcement.  Dominguez's mere insistence

12   that he did not commit a traffic violation, impatience, or "argumentative" tone of voice,

13   without more, did not objectively pose a physical danger to either officer.  *See Winterrowd*

14   *v. Nelson,* 480 F.3d 1181, 1185 (9th Cir. 2007) (finding driver's "belligerent attitude" and

15   belief that vehicle registration was not required posed no physical danger and did not justify

16   slamming him against the hood of a car).

17         Although Dominguez was ultimately found to be unarmed, Defendants claim Koller

18   reasonably feared Dominguez was hiding a weapon because he had delayed pulling over

19   and told Koller he was an "armed guard."  Koller therefore was justified in using immediate

20   significant force to "gain control and restrain" Dominguez when he "quickly reached away

21   . . . into the dark interior of the cluttered vehicle."  (Doc. 47 at 7; DSOF ¶¶ 20-24.)

22   Dominguez, however, clearly informed Koller that he had no guns or weapons, and while

23   he initially stated he was an "armed guard," he immediately clarified he was a "security

24   guard" and explained where he worked in that capacity.  Afterwards, Koller continued the

25   discussion with Dominguez, while Dominguez moved around the vehicle, reached into the

26   ―――――――――――――

27         [8] Defendants argue Dominguez's statement "You better lose your attitude" was
     implicitly threatening, and Dominguez argues the contrary.  Whether the statement is
28   properly viewed as aggression or mere agitation is a factual dispute reserved for a jury, and
     on summary judgment, the Court draws the reasonable inference in Dominguez's favor
     that it was non-threatening.

glove box, pulled items out from his back pocket, and then held out his documents without voicing any opposition.  At the same time, McElley shined his flashlight into the vehicle, illuminating the seats, the floor, and the glove compartment.  Koller then, without alerting McElley (who was standing outside the front passenger door), opened the driver's door and closely approached Dominguez.  Dominguez responded to his approach by putting his hands in the air with his documents in hand and made no verbal threat or aggressive movement towards Koller.

A reasonable jury considering the circumstances could find Koller did not fear, or did not reasonably fear, Dominguez was armed or dangerous, and that when Dominguez leaned over, he did not objectively pose a threat that justified the immediate use of substantial force.  *See Young*, 655 F.3d at 1163 (finding whether officer's fear was credible or reasonable was a factual dispute for the jury to decide); *A. K. H. v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016) (finding officer did not reasonably believe suspect was armed where, even though officer was told the suspect was a member of the "Southside Gang," he was also told the suspect was "not known to carry weapons" and the suspect appeared to be unarmed); *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (finding no objective basis to believe domestic violence suspect had a weapon or posed an immediate threat where his wife had informed the police he had no guns, he was in plain view, and he had removed his hands from his pajama pockets with no weapon); *Lalonde v. Cnty. of Riverside*, 204 F.3d 947, 958 n.16 (9th Cir. 2000) (finding the fact that suspect owned a rifle, did not like law enforcement officials, and was antagonistic, without more, did not present a threat to officer safety).

Further, even if Koller was reasonably mistaken in fearing Dominguez was potentially hiding a weapon, a reasonable jury could conclude that, when taking the totality of the circumstances into account, Koller "'unnecessarily creat[d] [his] own sense of urgency,'" and the potential threat of a weapon, without more, did not create an immediate danger that justified the use of substantial force.  *S.R. Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019) (quoting *Torres*, 648 F.3d at 1126); *see Deorle*, 272 F.3d at 1281 ("A

desire to resolve quickly a *potentially* dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." (emphasis added)).  Koller "had a variety of less intrusive options at his disposal" to ensure the officers' safety in the face of that potential threat—Koller could have accepted Dominguez's license and insurance and given Dominguez an opportunity to exit the vehicle *before* he opened the door; Koller could have opened the door and stood aside, rather than physically approach Dominguez; Koller could have warned Dominguez he would be placed under arrest if he refused to comply with his order; or Koller could have conferred with and sought assistance from McElley.  *Young*, 655 F.3d at 1165.  But Koller "chose none of these options, thus bypassing a variety of less painful and potentially injurious measures that would have been both feasible and reasonable under the circumstances."  *Young*, 655 F.3d at 1165-66.  Thus, "[a]lthough officers need not avail themselves of the least intrusive means of responding to an exigent situation, their failure to consider clear, reasonable and less intrusive alternatives to the force employed militates against finding the use of force reasonable."  *Rice*, 989 F.3d at 1124 (internal quotations omitted).

Defendants point to the fact that Koller gave Dominguez two warnings—"Get out of the car, or I'm going to rip you out of the car" and "I'm going to hurt you if you don't get out of the car right now."  If accepting Dominguez's version of the facts, a reasonable jury could find that both warnings were inadequate and "meaningless."  *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013).  The former warning was given only a moment before force was used and *after* Koller had opened the car door, physically approached Dominguez, and blocked Dominguez's exit from the car, while the latter was given *after* Koller had already begun to use substantial force.  Instead, before opening the door and approaching Dominguez, Koller could have reasonably ordered Dominguez to exit the car and warned him, without threatening harm, that the use of force was imminent if Dominguez did not comply.  A reasonable jury could conclude that, objectively, there "there was ample time to give that order or warning," but "no reason whatsoever not to do

so," especially given Dominguez's prior willingness to comply with Koller's requests. *Bryan*, 630 F.3d at 831 (internal quotations omitted).

Given the lack of objective facts indicating Dominguez was dangerous, the availability of other clear, reasonable, and less intrusive alternatives to gain his compliance and ensure officer safety, and the absence of any meaningful warning that force would be used, a reasonable jury could conclude that Dominguez did not pose an immediate threat to officer safety that justified the use of substantial force to "gain control and restrain" him. Accordingly, the most important factor, whether Dominguez "posed an immediate threat to the safety of the officers or others," also weighs against the interest in using immediate substantial force. *Young*, 655 F.3d at 1163.

### (iii)   Resisting or Evading Arrest

Lastly, a reasonable jury accepting Dominguez's version of the events could conclude he was not "actively resisting arrest or attempting to evade arrest by flight," and therefore, this factor too weighs against finding there was an interest in the use of immediate and substantial force. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).

Defendants argue Dominguez's delay in pulling over and parking choice was evasive, justifying the immediate use of force to remove him from the car and restrain him. Even by Defendants' account, however, Dominguez was not actively attempting to evade arrest by flight. Assuming there was a delay, which Dominguez disputes, the delay was not prolonged, he parked in a safe public location, he turned off his vehicle, he left the driver's window rolled down, and he immediately presented his driver's license and insurance. Dominguez was not told why he was pulled over, and prior to Koller's order to exit the car, Dominguez was not suspected of having committed any crime. Thus, there is no objective basis in the record from which a reasonable jury could conclude that Dominguez attempted to evade Koller by flight or posed an ongoing flight risk once stopped that created an exigent need to forcibly remove him from the car and restrain him. *See Liberal v. Estrada*, 632 F.3d 1064, 1079 (9th Cir. 2011) (finding plaintiff's purportedly evasive "choice of location in which to pull over" was not an "active" attempt to evade

arrest by flight).

Defendants argue Dominguez actively resisted by failing to obey Koller's command to get out of the car, also justifying the immediate use of force to gain his compliance and extract him from the car. If accepting Defendants' disputed account that, prior to any use of force, Dominguez *could have* complied with Koller's order to get out of the car, but did not, his mere "fail[ure] to exit [the] vehicle [was] not 'active resistance'" and did not justify the use of non-trivial, substantial force. *Coles*, 704 F.3d at 629-30 (citing *Bryan*, 630 F.3d at 829-30); *see also Nelson*, 685 F.3d at 881 (distinguishing between active and passive resistance and finding "the failure to fully or *immediately* comply with an officer's orders" does not rise "to the level of active resistance" (emphasis added)). Dominguez's noncompliance was not accompanied by any verbal refusal to exit or aggression. Indeed, given Dominguez's prior willingness to answer Koller's questions and provide his license and insurance, a reasonable jury could conclude Koller unreasonably failed to use other available means to facilitate his voluntary compliance, such as giving Dominguez an opportunity to exit the car before opening the door and physically approaching him, or warning Dominguez he could be arrested, or force would be used, if he did not exit. *See Young*, 655 F.3d at 1165 (finding plaintiff did not actively resist arrest when he refused to comply with order to reenter vehicle; before the officer struck him with his baton, plaintiff was not attempting to flee or being placed under arrest, nor was he warned he could be arrested for noncompliance).

Defendants argue Dominguez continued to actively resist and disobey Koller's subsequent orders to get out of the car and onto the ground, justifying the continued use of substantial force to remove Dominguez from the car and take him down to the ground. Defendants claim Dominguez locked his right leg in the door frame, held onto the steering wheel, pushed back, and hit Koller. However, accepting Dominguez's version of the disputed facts, which is not clearly contradicted by the body-camera videos,[9] a reasonable

---

[9] The officers' body-camera videos provide a largely blurred and obscured view of the encounter that neither clearly confirms nor negates Dominguez's account.

1    jury could find Dominguez did not resist, or if he did, such resistance was not sufficiently

2    active or forceful as to justify the continued use of substantial force.  *See Bryan*, 630 F.3d

3    at 830 (resistance "should not be understood as a binary state," and "the level of force an

4    individual's resistance will support is dependent on the factual circumstances underlying

5    that resistance").  According to Dominguez, he was not under arrest or warned he could be

6    placed under arrest; he did not verbally refuse to get out of the car; he did not use any

7    physical force against either officer; Koller did not give him an opportunity to comply, and

8    instead, repeatedly struck him and held his head, making it impossible for him to obey his

9    orders; once he could get his feet on the ground, he stood out of the car; and while in the

10   process, he braced himself on the steering wheel, he did so only to get out of the car without

11   being pushed face-first onto the ground.  *Cf. Mattos*, 661 F.3d at 445 (finding plaintiff

12   "engaged in some resistance to arrest" when, after she verbally refused to get out of her car

13   and was advised she was under arrest, she "later stiffened her body and clutched her

14   steering wheel to frustrate the officers' efforts to remove her from her car").

15          Defendants lastly argue Dominguez actively resisted being placed in handcuffs and

16   disobeyed their commands to "stop resisting," 'release your hand,' and 'put your hands

17   behind your back," justifying the continued use of substantial force to restrain him on the

18   ground.  Dominguez counters that when given the orders, he was lying on the ground, he

19   was not physically resisting or fighting the officers in any manner despite their orders to

20   the contrary, and Koller physically prevented him from immediately placing his hands

21   behind his back by pinning Dominguez's body and arms down with his bodyweight.  As

22   above, the body-camera videos, which partially show the two officers on top of Dominguez

23   while he is lying on the ground with his hands held out and proclaiming he did not do

24   anything, do not clearly contradict Dominguez's version of events.  A reasonable jury could

25   therefore find Dominguez was also not actively resisting the officers on the ground and the

26   continued use of substantial force to handcuff him or otherwise gain his compliance

27   thereafter was not justified.  *See Blankenhorn*, 485 F.3d at 480 (concluding that a

28   reasonable jury "could find that if [the plaintiff] did not maneuver his arms beneath his

1   body it eliminated the need for any use of force to release them, and thus that [the officer's]

2   punches were not reasonably justified by the circumstances").

3                              **(c)     Balance**

4          When taking the facts in the light most favorable to Dominguez, to the extent they

5   are supported by the record and not clearly discredited by the body-camera videos, a

6   reasonable jury considering the totality of the circumstances could conclude that Koller

7   and McElley's use of force against Dominguez was not justified.  *Scott*, 550 U.S. at 381

8   n.8; *Miller*, 340 F.3d at 964.

9          The repeated grabs, strikes, and kicks during his removal by two officers, tackling

10  him head-first onto the pavement, subsequent face-slam onto the pavement, and use of pain

11  compliance techniques by the two officers prior to and after handcuffing involved a non-

12  trivial and substantial amount of force.  The officers' countervailing need to use force was

13  minimal.

14         When the encounter began, Dominguez was compliant; he answered the questions

15  asked of him and provided his license and insurance without argument.  Dominguez was

16  not under arrest and was not attempting to evade arrest by flight.  Dominguez's suspected

17  traffic violations were minor and not dangerous in nature.  As the encounter continued,

18  Dominguez's behavior did not objectively pose a danger to the officers' safety, he was not

19  visibly armed, he denied having a weapon with him, and insofar as the officers mistakenly

20  but reasonably believed he possibly had a weapon, that possibility alone did not objectively

21  pose an immediate threat.

22         Leading up to the use of force, Koller did not give meaningful warnings or use

23  reasonable and less intrusive available alternatives.  Instead, Koller elected not to accept

24  Dominguez's documents or explain why he pulled him over, swiftly opened the door while

25  ordering him to exit the car, and immediately, closely approached him.

26         Dominguez's resistance preceding the use of force—failing to immediately comply

27  with Koller's orders to exit the vehicle—was, at most, passive.  The suspected

28  misdemeanor committed by such disobedience was also not serious or dangerous in nature.

1    Dominguez's resistance while the officers used continued force to remove him from the
2    vehicle was, disputably, minimal and did not pose a threat to the officers' physical safety.
3    After the officers removed him from the car, Dominguez, disputably, did not resist or
4    minimally resisted when the officers took him head-first into the ground, slammed his face
5    on the ground, and used pain compliance techniques prior to and after handcuffing him.

6         On balance, when viewing the genuinely disputed material facts in Dominguez's
7    favor, a reasonable jury could find that the officers' minimal interest in using force against
8    Dominguez at each stage of the encounter did not justify the non-trivial, substantial force
9    used against him.  Accordingly, there is a genuine dispute of material fact for trial as to
10   whether Koller and McElley's use of force was objectively unreasonable, and therefore
11   excessive, in violation of Dominguez's right under the Fourth Amendment against
12   unreasonable seizures.

                    **2.      Clearly Established Right**

14        In the years preceding the use of force at issue in this case, the right to be free from
15   the unreasonable use of non-trivial force for engaging in mere passive resistance to an
16   officer's orders was clearly established.  *See Gravelet-Blondin*, 728 F.3d at 1093 (2013)
17   ("[t]he right to be free from the application of non-trivial force for engaging in mere passive
18   resistance was clearly established prior to 2008"); *Nelson*, 685 F.3d at 881 (2012) (courts
19   have previously recognized "that failure to fully or immediately comply with an officer's
20   orders neither rises to the level of active resistance nor justifies the application of a non-
21   trivial amount of force").

22        Existing precedent was also sufficiently clear to put any reasonable officer on notice
23   that the immediate use of non-trivial, substantial force to gain a driver's compliance during
24   a traffic stop—including grabbing, punching, and kicking a driver—was excessive where,
25   as here, the driver engaged in mere passive resistance in failing to immediately comply
26   with the officer's orders, was suspected of only traffic violations or nonviolent offenses,
27   did not appear armed, and posed no apparent threat to officer safety.  *See Coles*, 704 F.3d
28   at 628-30 (2012) (finding reasonable jury could conclude force was excessive where

officers broke driver's car window, kicked driver as a compliance tactic, and dragged driver through the window; driver did not "actively resist[] arrest by failing to comply with a lawful order to exit the vehicle"; "the risk of evasion or escape was minimal"; the suspected auto theft felony was nonviolent; driver "did not appear armed"; driver did not pose an immediate threat even though he had "moved his hands off of the steering wheel at various points during the encounter"; and officers could have chosen a "reasonable, less-intrusive alternative course of action," "[r]ather than precipitating an exigency"); *Young*, 655 F.3d at 1158 (2011) (denying qualified immunity for excessive force where officers "physically struck and used pepper spray against" driver during a traffic stop; driver only resisted passively when he verbally refused to reenter his vehicle; the suspected traffic violations and misdemeanor disobedience were minor and not indicative of dangerousness; driver was not being placed under arrest nor attempting to flee; driver posed no apparent threat to officer or public safety; driver was not given warning that he could be arrested for his noncompliance with the order to reenter his truck; and "a variety of less intrusive alternatives to the use of such force was available"); *Bryan*, 630 F.3d at 823-31 (2010) (finding reasonable jury could conclude "intermediate" force during a traffic stop was excessive where officers tased driver; driver's failure to "comply with the command to remain in his vehicle did not constitute 'active resistance' supporting a substantial use of force"; the suspected traffic violations and disobedience offenses were minor and gave no indication of dangerousness; driver appeared unarmed and his behavior did not objectively pose a threat to officer safety, despite having hit his steering wheel and his body, and yelled gibberish and expletives; officer did not give "feasible . . . warning that the use of force was imminent if [the driver] did not comply"; and officer "apparently did not consider less intrusive means").

Similarly, existing precedent was sufficiently clear to put any reasonable officer on notice that the continued use of substantial force to gain compliance and restrain a suspect—including tackling a suspect to the ground, slamming a suspect's face on the ground, and applying pain compliance techniques before and after a suspect is handcuffed

on the ground—was excessive under the circumstances. *See Blankenhorn*, 485 F.3d at 477-81 (2007) (denying qualified immunity for excessive force where officers tackled suspect to the ground, punched suspect on the ground, pushed suspect's face into the pavement, handcuffed suspect, and used hobble restraints; the suspected trespass offense was minor; suspect did not pose a serious threat to the officers' or others' safety; suspect had been cooperative in the past; while suspect refused to kneel down and pulled away, given the "lack of forewarning, the swiftness, and the violence with which the [] officers threw themselves upon [the suspect]," jury could find resistance was reasonable; and officers did not attempt less violent means to arrest suspect); *Meredith v. Erath*, 342 F.3d 1057, 1060 (9th Cir. 2003) (denying qualified immunity for excessive force where officers forcibly threw suspect on the ground, twisted her arms, and placed handcuffs on her wrists so tightly that they caused her pain and extensive bruising; suspected tax evasion was non-violent; suspect did not pose threat to officers; and suspect only "passively resisted handcuffing"); *Santos v. Gates*, 287 F.3d 846, 853-54 (9th Cir. 2002) (finding reasonable jury could conclude officers' take-down of suspect was excessive where the "crime at issue was not at all serious"; suspect "did not pose a significant or immediate safety risk"; and suspect was "passive" and did not actively resist arrest by failing to fully comply officers' instructions).

Defendants argue existing precedent supported the use of force in this case, pointing to: *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090 (9th Cir. 2006), *Johnson v. Cnty. of Los Angeles*, 340 F.3d 787 (9th Cir. 2003), *Jackson v. City of Bremerton*, 268 F.3d 646 (9th 2001), *Forrester v. City of San Diego*, 25 F.3d 804 (9th Cir. 1994), and *Eberle v. City of Anaheim*, 901 F.2d 814 (9th Cir. 1990). (Docs. 25 at 12; 47 at 10.) These cases, however, bear little, if any, resemblance to the circumstances in this case. *See Tatum*, *supra* ("objectively reasonable for [officer] to use a control hold to secure [suspect's] arm long enough to place him in handcuffs" where suspect resisted arrest and "posed a threat to himself, to the police, and possibly to anyone who passed by him"); *Jackson*, *supra* (use of force reasonable where officers used chemical irritant spray with warning, pushed, and

handcuffed plaintiff when, after "[f]ights broke out between the officers and other members of [plaintiff's] group" in a public park, she interfered with the officers' arrest of her son on an outstanding warrant); *Forrester, supra* (officers' use of "minimal and controlled force" to remove abortion protesters was reasonable where protesters refused to move when officers attempted to arrest them and were given advance warning they would be subject to pain compliance measures if they did not move); *Johnson*, *supra* (use of force reasonable where armed bank robbery suspect "who had led police on a long, dangerous chase" did "not allege anything more violent than hard pulling and twisting"); *Eberle*, *supra* (officer's use of a finger-hold to control a belligerent football fan was objectively reasonable).[10]

At the time of Koller and McElley's use of substantial force, there was a sufficiently established body of relevant case law that together placed the unlawfulness of their conduct under the circumstances "beyond debate." *al-Kidd*, 563 U.S. at 741. Koller and McElley are not entitled to qualified immunity as a matter of law, and summary judgment on Dominguez's excessive force claim is denied.

## B. False Arrest under 42 U.S.C. § 1983

Defendants argue they are entitled to qualified immunity on Dominguez's false arrest claim because there was probable cause to believe Dominguez violated Ariz. Rev. Stat. § 13-2508 and Scottsdale City Code § 19-13.[11]

The Fourth Amendment's safeguard against unreasonable seizures prohibits warrantless arrests by law enforcement officers without probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). To determine whether a Fourth Amendment violation has occurred, courts evaluate whether the known facts, "'viewed from the standpoint of an

---

[10] Both parties also dedicate time to analogizing or distinguishing this case from *Rice*, which also involved a traffic stop where officers used force to pull the driver from the car, implemented a take-down, and held the driver on the ground before handcuffing him. 989 F.3d at 1117. The Court, however, does not include *Rice* in this portion of its qualified immunity analysis because *Rice* was decided after the alleged constitutional violation in this case occurred and, as did *Rice*, the Court finds there was sufficient existing precedent that clearly established the right at issue here.

[11] Defendants do not argue there was probable cause to arrest Dominguez for the other dismissed criminal charges of assault under Ariz. Rev. Stat. § 13-1203(A)(3) or failure to comply with a police officer under § 28-622.

objectively reasonable police officer,'" provided probable cause to believe a crime had been or was being committed. *District of Columbia v. Wesby*, 583 U.S. ___, 138 S. Ct. 577, 586 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)); *Devenpeck*, 543 U.S. at 153. Probable cause requires the presence of facts showing a "probability or substantial chance of criminal activity," *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983), but does not demand "the same type of specific evidence of each element of the offense as would be needed to support a conviction," *Adams v. Williams*, 407 U.S. 143, 149 (1972). An officer's "subjective reason for making the arrest [also] need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck*, 543 U.S. at 153. Thus, if "the facts and circumstances within [the officer's] knowledge are sufficient for a reasonably prudent person to believe that the suspect has committed a crime," a warrantless arrest does not violate the Fourth Amendment. *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011).

### 1.     Resisting Arrest

Defendants argue that "[i]n disregard of numerous commands, Dominguez 'actively resisted' the officers by holding onto the steering wheel, an act he later admitted (on OBC video) and which the OBC video of his actions documents," and thus "[p]robable cause then existed for the felony crime of Resisting Arrest, A.R.S. § 13-2508." (Doc. 25 at 16; *but see id.* at 11 (arguing there was probable cause to arrest Dominguez for "felony and misdemeanor" resisting arrest because "he did not want to get out of his car and held onto the steering wheel").

In Arizona, a person commits the offense of resisting arrest in violation of Ariz. Rev. Stat. § 13-2508 by (1) intentionally preventing or attempting to prevent, (2) a person reasonably known to him to be a peace officer, (3) acting under color of official authority, (4) from effecting an arrest, (5) either by (a) using or threatening to use physical force or other means creating a substantial risk of physical injury (felony) or (b) engaging in passive resistance (misdemeanor). Ariz. Rev. Stat. § 13-2508(A). "Effecting" for purposes of § 13-2508 means "an on-going process toward achieving, producing, making, or bringing

about, an arrest." *State v. Mitchell*, 62 P.3d 616, 618 (Ariz. Ct. App. 2003).

Based on the record presented on summary judgment, no reasonable jury could conclude, and no reasonable officer could believe, there was probable cause to arrest Dominguez for resisting arrest. Although Defendants repeatedly argue Dominguez was "resisting arrest," they do not claim that at the time Dominguez held onto the steering wheel, Koller or McElley were "effecting an arrest." Indeed, Defendants do not discuss Dominguez's arrest or respond to Dominguez's argument that no arrest was made or being attempted when the officers used force against him. Nor have Defendants presented any facts which could objectively be viewed as an attempt to initiate an arrest prior to his alleged resistance. The officers did not explain to Dominguez why he had been pulled over, advise Dominguez he was under arrest, or warn Dominguez that his failure to comply could result in his arrest.[12] Thus, absent any allegation or evidence of an attempt to arrest Dominguez at the time he held onto the steering wheel, there was no probable cause to believe he resisted arrest in violation of § 13-2508. *See Rosenbaum*, 663 F.3d at 1078; *State v. Womack*, 847 P.2d 609, 615 (Ariz. Ct. App. 1992) (finding "it difficult to see how defendant's initial flight could be characterized as resisting arrest, since no arrest was being attempted").

### 2.    Refusal to Obey Police

Defendants argue there was probable cause to arrest Dominguez for refusing to obey police" in violation of Scottsdale City Code § 19-13, when he "disregarded 37 lawful commands including "get out of the car," "get on the ground," "stop resisting," "release your hand," and "put your hands behind your back." (Doc. 25 at 11.)

Section 19-13 of the Scottsdale City Code, entitled "refusal to obey police," provides that "[n]o person shall refuse to obey a peace officer engaged in the discharge of his duty, or any other person authorized to aid in quelling any riot, rout or affray." As its title makes clear, the offense "requires that a person 'refuse' to obey an order." *State v.*

---

[12] Notably, when McElley first told Dominguez he could not leave to go to work because he was under arrest, McElley could not explain why he was being arrested and told him to ask the "other officer."

1  *Kaiser*, 65 P.3d 463, 467 (Ariz. Ct. App. 2003).  "To refuse an order is an affirmative act
2  of rejection, not a bare failure to obey but a knowing and deliberate decision to not obey."
3  *Id.*  Therefore, "[a]bsent a refusal to obey, as opposed to a mere failure to obey, there can
4  be no violation of the ordinance."  *Id.*

5       Accepting Dominguez's version of the known facts, which are not clearly
6  contradicted by the video evidence, a reasonable jury could conclude that, prior to the
7  officers' use of force, there was no probable cause to arrest him for *refusal* to obey police
8  in violation of § 19-13, because at most, he merely *failed* to immediately comply with the
9  orders to get out of the car.  Dominguez did not verbally refuse the officers' orders and had
10  complied with Koller's earlier requests without objection.  Dominguez's statements "you
11  don't have the right to open the door," "this is private property," and "don't touch me"
12  were not, objectively, refusals to exit the vehicle, rather than mere responses to Koller
13  opening the car door and physically approaching him.  Dominguez also claims that when
14  Koller first ordered him to get out of the car, he did not give him an opportunity to obey
15  the order, and instead, opened the door and obstructed Dominguez's ability to exit, making
16  it impossible for him to obey the orders to get out of the car.

17       A reasonable jury could conclude, however, that after the officers began to use force,
18  there was probable cause to believe Dominguez had violated § 19-13.  Even when viewing
19  the known facts in the light most favorable to Dominguez, an objective officer could have
20  reasonably believed Dominguez refused to comply with the order to get out of the car when
21  he held onto the steering wheel.  While Dominguez claims he was unable to get out of the
22  car and braced himself on the wheel only to avoid injury, a reasonable officer could have
23  viewed the act of holding the steering wheel as an "affirmative act of rejection" to exiting
24  the car as ordered.  *Kaiser*, 65 P.3d at 467.  Thus, the known facts, when "viewed from the
25  standpoint of an objectively reasonable police officer," provided probable cause to arrest
26  Dominguez for violating § 19-13.  *Wesby*, 138 S. Ct. at 586.  Accordingly, Dominguez's
27  warrantless arrest did not violate the Fourth Amendment and Defendants are entitled to
28  qualified immunity as a matter of law.  *Rosenbaum,* 663 F.3d at 1076.  Summary judgment

1  is therefore granted on Dominguez's false arrest claim.

2  **V.  State Law Claims**

3  **A.  Assault and Battery**

4  Defendants argue they are entitled to summary judgment on Dominguez's assault

5  and battery claim because he failed to serve Koller and McElley with a notice of claim

6  pursuant to Ariz. Rev. Stat. § 12-821.01, and because Scottsdale cannot be held vicariously

7  liable for claims against employees that are barred and dismissed under § 12-821.01.

8  **1.  Direct Liability**

9  In Arizona, before suing a public entity or employee for damages, a party must serve

10  the entity or employee with a notice of claim "within one hundred eighty days after the

11  cause of action accrues."  Ariz. Rev. Stat. § 12-821.01(A).  If a notice is not timely served

12  on the liable public entity or employee, the claim "is barred and no action may be

13  maintained."  *Id.*  "Actual notice and substantial compliance do not excuse failure to

14  comply with the statutory requirements of [] § 12-821.01(A)."  *Falcon ex rel. Sandoval v.*

15  *Maricopa Cnty.*, 144 P.3d 1254, 1256 (Ariz. 2006) (en banc).

16  Defendants assert, and Dominguez does not dispute, that Koller and McElley are

17  public employees who should have been served with a notice of claim pursuant to § 12-

18  821.01.  *See Villasenor v. Evans*, 386 P.3d 1273, 1276 (Ariz. Ct. App. 2016) (the notice

19  requirement applies "to claims against public employees that arise from conduct within the

20  scope of their public employment").  It is also undisputed that Dominguez did not serve

21  either officer with a notice of claim and the time to do so has passed.  (PSOF ¶¶ 102-111;

22  DSOF ¶¶ 102-111.)  Accordingly, because Dominguez failed to timely serve them with a

23  notice of claim, and he cannot cure that failure now, his claim against Koller and McElley

24  is barred pursuant to § 12-821.01(A).  Summary judgment is therefore granted on

25  Dominguez's assault and battery claim against Koller and McElley.

26  **2.  Vicarious Liability**

27  In Arizona, an employer may be held vicariously liable for the tortious conduct

28  committed by its employees in the course and scope of their employment.  *Engler v. Gulf*

1    *Interstate Eng'g, Inc.*, 280 P.3d 599, 601 (Ariz. 2012).  "Vicarious liability results solely

2    from the principal-agent relationship: 'those whose liability is only vicarious are fault

3    free—someone else's fault is imputed to them by operation of law.'"  *Kopp v. Physician*

4    *Grp. of Ariz., Inc.*, 421 P.3d 149, 151 (Ariz. 2018) (quoting *Wiggs v. City of Phoenix*, 10

5    P.3d 625, 629 (Ariz. 2000)); *see* Ariz. Rev. Stat. § 12-2506(D)(2) (upon entry of judgment,

6    a defendant is liable "for the fault of another person . . . if the other person was acting as

7    an agent or servant of the [defendant]"); *Chaney Bldg. Co. v. City of Tucson*, 716 P.2d 28,

8    30-31 (Ariz. 1986) (observing vicarious liability is synonymous with derivative liability).

9    Thus, when a judgment is entered in favor of the employee, the employer is not vicariously

10   "responsible for the fault" of the employee, because "there is no fault to impute" to the

11   employer by law.  *Law v. Verde Valley Med. Ctr.*, 170 P.3d 701, 705, 217 Ariz. 92, 96

12   (Ariz. Ct. App. 2007).  "Put simply, because the agent has been adjudicated not liable, as

13   a matter of law, the principal is not [vicariously] liable."  *Jamerson v. Quintero*, 313 P.3d

14   532, 535 (Ariz. Ct. App. 2013).

15          Here, the Court has found the assault and battery claim against Koller and McElley

16   is barred and granted summary judgment.  Because Koller and McElley are not liable for

17   Dominguez's assault and battery claim, no liability can be imputed to Scottsdale for that

18   claim by operation of law.  *See Howard v. Washington Elementary Sch. Dist. 6*, No. 1 CA-

19   CV 20-0390, 2022 WL 363766 (Ariz. Ct. App. Feb. 8, 2022) (affirming grant of summary

20   judgment on vicarious liability claim against public employer based on the dismissal of

21   claim against employee for failure to timely serve notice of claim); *Laurence v. Salt River*

22   *Project*, No. 1 CA-CV 21-0100, 2021 WL 5183957 (Ariz. Ct. App. Nov. 9, 2021) (same);

23   *Angulo v. City of Phoenix*, No. 1 CA-CV 12-0603, 2013 WL 3828778 (Ariz. Ct. App. July

24   16, 2013) (same).

25          Dominguez argues *Banner Univ. Med. Ctr. Tucson Campus, LLC v. Gordon,* 467

26   P.3d 257 (Ariz. Ct. App. 2020) ("*Banner*") is dispositive and establishes that the vicarious

27   liability claim against Scottsdale is not precluded.  That decision, however, was recently

28   vacated by the Arizona Supreme Court, *Banner Univ. Med. Ctr. Tucson Campus, LLC,* 502

P.3d 30 (Ariz. 2022).  Further, *Banner* explicitly distinguished it did not involve "the straightforward situation of a public entity and its employee," but rather addressed only "whether a private employer is shielded by a statute intended to protect state actors."  467 P.3d at 262-63.  Accordingly, summary judgment is granted on Dominguez's vicarious liability claim against Scottsdale.

### B. Negligence

Negligent training and supervision are properly characterized as direct theories of liability, as opposed to derivative theories of liability.  *See Kopp*, 421 P.3d at 151 (a claim for negligent hiring and supervision is a direct theory of liability based on the employer's independent negligence and is distinct from a claim premised on vicarious liability). Therefore, unlike a vicarious liability claim, dismissal of a claim against an employee does not require dismissal of claims against the employer that are based on independent direct theories of negligence.  *Id.* at 152-53.  It follows that summary judgment on Dominguez's assault and battery claim does not preclude him from maintaining a claim against Scottsdale based on its own independent negligence, even if it may require proof of Koller and McElley's tortious conduct.

Defendants nevertheless argue that because the force used by Koller and McElley was reasonable and justified under Ariz. Rev. Stat. §§ 13-409 and 13-413, the torts of assault and battery fail, and therefore, Scottsdale is not negligent as a matter of law.  *See Kuehn v. Stanley*, 91 P.3d 346, 352 (Ariz. Ct. App. 2004) ("For an employer to be held liable for the negligent hiring, retention, or supervision of an employee, a court must first find that the employee committed a tort," and "[i]f the theory of the employee's underlying tort fails, an employer cannot be negligent as a matter of law").  "Section 13-409 provides a justification defense for law enforcement officers who use physical force," and "[i]f the officer's use of force is justified under § 13-409, the officer is immune from civil liability" under § 13-413.  *Ryan v. Napier*, 425 P.3d 230, 238-39 (Ariz. 2018).  While these statutes provide officers with a defense to civil liability "regardless of the theory of recovery" against *them*, *Napier*, 425 P.3d at 239, Defendants point to no authority to suggest these

1   statutes immunize Scottsdale from liability for its own independent negligent actions, even

2   if it requires proof of tortious conduct for which Koller and McElley are not liable.  *See*

3   *Kopp, supra*; *Atencio v. Arpaio*, 674 F. App'x 623, 627 (9th Cir. 2016) ("the Arizona

4   justification statutes . . . merely provide a potential defense [to liability] when the merits

5   are adjudicated").   However, even if §§ 13-409 and 13-413 also shield an officer's

6   employer from liability, as previously discussed, disputed questions of fact remain as to

7   whether the officers' use of force was reasonable and justified, and therefore, Scottsdale is

8   not entitled to such defense as a matter of law.

9         Next, Defendants argue Scottsdale is not negligent as a matter of law under Ariz.

10  Rev. Stat. § 12-716(A), which provides statutory presumptions that "are triggered when a

11  law enforcement officer intentionally uses physical force to arrest or capture a suspect and

12  the suspect is injured."  *Napier*, 425 P.3d at 237.  Under § 12-716(A)(1), "[t]he officer is

13  'presumed to [have been] acting reasonably' in using physical force," and under § 12-

14  716(A)(2), "the officer's employer is 'presumed to have reasonably hired and trained' its

15  officers to use that physical force."  *Id.*  The latter presumption applies where a plaintiff

16  was harmed while "attempting to commit, committing or fleeing after having committed

17  or attempted to commit a felony criminal act" and the "officer threaten[ed] to use or use[d]

18  physical force . . . to either: (a) [p]rotect himself or another person against another person's

19  use or attempted use of physical force," or "(b) [e]ffect an arrest or prevent or assist in

20  preventing a plaintiff's escape."  Ariz. Rev. Stat. § 12-716(A)(2).  As discussed above,

21  disputed questions of fact also remain to whether Dominguez committed a felony offense,

22  whether Dominguez used or attempted to use physical force against the officers, and

23  whether the officers' used force to effect an arrest or prevent an escape.  Defendants

24  therefore fail to demonstrate they are entitled to the statutory presumption under Ariz. Rev.

25  Stat. § 12-716(A)(2) as a matter of law.  Accordingly, summary judgment is denied as to

26  Dominguez's negligence claim against Scottsdale.

27  . . . .

28  . . . .

1    **IT IS ORDERED:**

2          (1)      The reference to the Magistrate Judge as to Defendants' Motion for Summary

3    Judgment (Doc. 25) is **withdrawn**.

4          (2)      The Motion (Doc. 25) is **granted in part** as to Plaintiff's claims for assault

5    and battery (Count One) and false arrest (Count Four) and is otherwise **denied**.

6          (3)      This matter shall remain referred to the Magistrate Judge pursuant to Rules

7    72.1 and 72.2 of the Local Rules of Civil Procedure for all pretrial proceedings as

8    authorized under 28 U.S.C. § 636(b)(1).

9

10          Dated this 24th day of February, 2022.

11

12

13

14                                        _____

15                                        Susan R. Bolton
                                          United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28